| | |
|---|---|
| JOHN J. CALNIN, ET AL., | |
| Plaintiffs, | Case No. 05-C-694 |
| v. | |
| WALLACE J. HILLIARD, | |
| Defendant. | |
| | |
| JOHN F. BUTZ, ET AL., | |
| Plaintiffs, | Case No. 05-C-784 |
| v. | (Consolidated with 05-C-694) |
| WALLACE J. HILLIARD, | |
| Defendant. | |
| | |
| GREG J. DECLEENE, ET AL., | |
| Plaintiffs, | Case No. 05-C-958 |
| v. | (Consolidated with 05-C-694) |
| WALLACE J. HILLIARD, | |
| Defendant. | |
| IRREVOCABLE TRUST OF ROY E. DOWNHAM of JANUARY 30, 1979, ET AL., | |
| Plaintiffs, | Case No. 05-C-1092 |
| v. | (Consolidated with 05-C-694) |
| WALLACE J. HILLIARD, | |
| Defendant. | |
| GREGORY J. LARSEN, | |
| Plaintiffs, | Case No. 05-C-1148 |
| v. | (Consolidated with 05-C-694) |
| WALLACE J. HILLIARD, | |
| Defendant. | |

**BRIEF SUPPORTING DEFENDANT'S MOTION FOR
SEVERANCE OR, IN THE ALTERNATIVE, BIFURCATION OF CLAIMS**

## I. INTRODUCTION

Defendant Wallace J. Hilliard ("Hilliard") had a dream of operating an airline in Florida. He spent millions of his own money to get the company started, and sought investments from others to obtain capital to make the company successful. Hilliard's prospectus documents clearly outlined the dangers inherent in attempting to enter the airline industry and disclosed the possibility that the ability to gain regulatory approvals could prevent the company from ever making a single flight. Unfortunately, despite the best efforts of everyone involved, the company struggled and its shareholders eventually sold the company. The majority of the shareholders simply took this circumstance for what it was – a potentially lucrative but also risky investment opportunity that ultimately failed. A few, however, sought to shift these inherent risks to Hilliard himself by filing lawsuits in an effort to recover their investments. While many of Plaintiffs' claims were dismissed on summary judgment, a significant number of diverse and factually unique claims remain. For this reason, Hilliard respectfully moves this Court for an order severing or bifurcating the remaining claims in to eight separate, discrete, and logically related actions.

## II. PROCEDURAL BACKGROUND

Prior to this Court's ruling on Hilliard's motion for summary judgment, 16 purchasers of FAH stock remained as named Plaintiffs in this action. The remaining Plaintiffs were: John and Yvonne Calnin ("Mr. Calnin," "Mrs. Calnin," respectively or together, the "Calnins"), Greg and Ann DeCleene ("Mr. DeCleene," "Mrs. DeCleene," respectively or together, the "DeCleenes"), Flanagan Brothers, Inc. ("Flanigan Brothers"), Alfred H. and Jeane K. Fleck Revocable Trust

(the "Fleck Trust"), Alfred H. and Jeane K. Fleck ("Mr. Fleck," "Mrs. Fleck," respectively or together, the "Flecks"), Thomas J. Hahn ("Mr. Hahn"), the Kenneth L. and Lucille C. Jossart Revocable Trust of January 29, 1994 (the "Jossart Trust"), Kenneth L. and Lucille C. Jossart ("Mr. Jossart," "Mrs. Jossart," respectively or together, the "Jossarts"), David W. and Yvonne M. Krutz Revocable Trust (the "Krutz Trust"), David W. and Yvonne M. Krutz ("Mr. Krutz," "Mrs. Krutz," respectively or together, the "Krutzes"), Janice and David Schonke ("Mrs. Schonke," "Mr. D. Schonke," respectively or together, the "Schonkes"), Stephen F. Schonke ("Mr. S. Schonke"), Paul and Dawn Soletski ("Mr. Soletski," "Mrs. Soletski," respectively or together, the "Soletskis"), Daniel Whetter ("Mr. Whetter"), Don Zellner ("Mr. Zellner"), and David and Kathy Perret (the "Perrets") (together the "Plaintiffs").[1]

On May 4, 2007, Hilliard filed a motion for summary judgment challenging the sufficiency of Plaintiffs' evidence, and legal validity of many of their claims. In its Order of February 5, 2008, this Court effectively reduced this action to the following claims: (1) misrepresentation under 17 C.F.R. § 240.10b-5(b) and 15 U.S.C. § 78j(b) with respect to all Plaintiffs; (2) claims of five Plaintiffs under the Wisconsin Securities Law, Wis. Stat. § 551.41(2); (3) misrepresentation under the Florida Securities Act, Fla. Stat. § 517.301(a)(2); (4) Mr. Zellner's claim for statutory misrepresentation in violation of Wis. Stat. § 100.18; and (5) various allegations of common law strict liability misrepresentation and negligent misrepresentation by all of the remaining Plaintiffs.

Hilliard seeks severance or bifurcation of Plaintiffs' remaining claims, streamlining the trial process for the court and reducing the specter of jury confusion and potential prejudice to Hilliard. The uniqueness and complexity of the remaining claims warrants separation of the

---

[1] The Court's Order on Hilliard's motion for summary judgment does not include the Perrets as remaining plaintiffs. Based on the substance of the Court's Order, however, it appears that some of the Perrets' claims have not been dismissed.

issues for trial, whether accomplished under Rule 21 or Rule 42(b) of the Federal Rules of Civil Procedure.

## III. FACTUAL BACKGROUND[2]

As the Court is aware, this case arises out of Plaintiffs' purchase of stock in Florida Air Holdings, Inc. ("FAH"). Hilliard founded FAH with the goal of operating both a charter and regional commuter airline that would target underserviced markets in Florida. (Order Denying in Part and Granting in Part Defendant's Motion for Summary Judgment (hereinafter "Order") at 4). Hilliard was the largest single investor in FAH, investing approximately $8,576,249 of his own money. Affidavit of Wallace J. Hilliard Opposing Motion for Summary Judgment dated June 8, 2007 ("Hilliard"), ¶ 6. The Hilliard Family Foundation, created by Hilliard, invested an additional $1 million in FAH, and The Wallace J. Hilliard Flint Trust invested another $150,000. *Id.*

Throughout its existence, FAH owned a regulatory permit allowing it to operate charter flights, but lacked regulatory authority to fly as a scheduled commuter airline. (Order at 4). FAH did, however, acquire a Federal Aviation Regulation Part 121 Commuter Air Carrier Operating Certificate ("Certificate") through Sunrise Airlines, Inc. ("Sunrise"). Hilliard acquired Sunrise in February 2001 in a bankruptcy sale and then transferred his ownership of its capital stock to FAH. *Id.* Due to Sunrise's bankruptcy petition, however, the Department of Transportation ("DOT") had temporarily suspended the Certificate.

On February 8, 2002, the DOT issued an "Order to Show Cause" tentatively approving the Certificate. Shortly thereafter, however, the Federal Aviation Administration ("FAA") notified the DOT of pending sanctions against Plane-1 Leasing, an unrelated company owned

---

[2] Most of the evidentiary material referenced herein has previously been submitted to this Court in support of Hilliard's Motion for Partial Summary Judgment. Materials not previously submitted are submitted as exhibits to the Declaration of Sean O'D. Bosack.

Hilliard. The DOT inquired to FAH about these allegations and also requested additional information regarding its corporate structure and financial stability. (Hilliard, ¶ 22, Ex. B). These inquiries were disclosed to FAH's shareholders, including several of the Plaintiffs, in March 2002. (Hilliard, ¶ 22, Ex. B; Affidavit of Winston A. Ostrow Supporting Motion for Partial Summary Judgment ("Ostrow"), Ex. I, pp. 23-29). The DOT ultimately withdrew its tentative approval in May 2002, citing the regulatory issues with Plane-1 Leasing as one of the factors bearing on its decision. On June 18, 2004, FAH's shareholders voted to sell the airline to Golden Airways, Inc. in exchange for an assumption of FAH debt and the issuance of Golden Airways stock to FAH shareholders. (Hilliard, ¶ 32; Order at 5).

The Plaintiffs purchased stock at various times between February 2001 and March 2003. (Hilliard, ¶ 34). Each plaintiff, however, purchased stock at different times, in different amounts, for different reasons, based on information received from different people. (*See, e.g.*, Ostrow, ¶ 4, Ex. A, pp. 60-64 (J. Calnin), Ex. T, p. 12 (Yvonne Krutz), and ¶ 36, Ex. CC, p. 54-55 (Mr. S. Schonke)). The only similarity between all Plaintiffs is that Hilliard sent them an investment letter outlining the risks of investing in FAH and that they signed subscription agreements in connection with their purchases of FAH stock. This subscription agreement provided, among other things, a certification that each plaintiff was an accredited investor. (Hilliard, ¶ 36; Ostrow, Exs. C, E, G, L, N, Q, U, Y-1, Y-2, BB, DD, HH, JJ & NN); *see also* 17 C.F.R. § 230.501 (accredited investor corporations and trusts must have assets in excess of $5 million or the equity owners must all be accredited investors).

While FAH was ultimately unsuccessful, Hilliard and the other managers, who changed over time, worked tirelessly to achieve their goals. (Hilliard, ¶¶ 16, 18-32). In fact, Hilliard personally guaranteed loans made in connection with FAH. (Hilliard, ¶ 17). When they went

into default in late 2001/early 2002, Hilliard negotiated a one-year Forbearance Agreement. *Id.* When no alternative lender could be found in 2003, Hilliard personally paid M&I Bank the $5,042,145 due on the loans, including $3,600,000 due from FAH, and Hilliard became FAH's principal lender. *Id.* The managers' hard work led to some significant successes, including the DOT's issuance of the Order to Show Cause in February 2002. Unfortunately, however, the managers were ultimately unable to get the final approvals necessary for FAH to operate as a scheduled commuter airline. (Order at 5) Despite their efforts to enable FAH to succeed, the venture ultimately failed for numerous reasons.

## IV. STANDARDS FOR SEVERANCE AND BIFURCATION

"The Federal Rules grant a district court discretion either to order a separate trial of any claim or issue, or to completely sever a claim so that it may proceed separately." *Reinholdson v. Minnesota*, 346 F.3d 847, 850 (8th Cir. 2003). While often used interchangeably, severance and bifurcation constitute two different legal principles for separating plaintiffs' claims prior to trial. Severance of claims falls under Federal Rule of Civil Procedure 21, while a court may bifurcate issues or claims under Rule 42(b). In the present case, both Rules provide an appropriate mechanism for separating plaintiffs' claims.

Rule 21 provides that "[a]ny claim against a party may be severed and proceeded with separately." Fed. R. Civ. P. 21. A district court has broad discretion to order severance of claims pursuant to Rule 21. *See Hohlbein v. Heritage Mut. Ins. Co.*, 106 F.R.D. 73, 78 (E.D. Wis. 1985). In exercising this discretion, a court may sever claims under Rule 21 when they are "separate and discrete." *See Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000). A claim is separate and discrete when it is capable of resolution despite the outcome of the other claims. *Id.* "The practical effect of severance of previously joined claims is the creation of two or more separate actions." *Hohlbein*, 106 F.R.D. at 78. As separate actions, the final judgment

6

in each action is separately appealable. Severance under Rule 21 is appropriate in this case because Plaintiffs claims are separate and discrete, and capable of resolution without regard to the outcome of any other action.

As an alternative to severance, bifurcating the claims in this case under Federal Rule of Civil Procedure 42(b) would also be appropriate. This Rule provides: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim . . .." Fed. R. Civ. P. 42(b). While severance creates separate cases, bifurcation leads to separate factual inquiries, in front of separate juries, in the context of a single, properly joined case. *See Hohlbein*, 106 F.R.D. at 78. District courts also retain broad discretion to order separate trials under Rule 42(b). *See Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000) ("The district court has considerable discretion to order the bifurcation of a trial, and we will overturn this decision only upon a clear showing of abuse"). The facts of this case also support bifurcation because the evidence concerning each Plaintiff's claims is sufficiently unique to justify separate trials in the context of a single, properly joined case.

## V.  THE COURT SHOULD SEVER OR BIFURCATE THE REMAINING CLAIMS

Hilliard respectfully moves this Court for an order of severance or bifurcation to avoid prejudice and jury confusion, and streamline the trial process for the court, its staff, and the parties.

### A.     Summary of Argument

After this Court's ruling on Defendant's motion for summary judgment, there are

essentially twelve remaining Plaintiffs:[3] the Schonkes, the Hahns, the DeCleenes, the Flecks, the Jossarts, the Perrets, the Soletskis, Flanagan Bros., the Calnins, the Krutzs, Daniel Whetter, and Donald Zellner. As indicated above, these twelve Plaintiffs share five remaining causes of action between them. These causes of action should be severed or bifurcated so as to create eight separate trials for the following Plaintiffs or groups of Plaintiffs: 1) the Shoenkes, the Hahns, and the Flecks; 2) the Jossarts, the Perrets, the Soletskis, and the Krutzs; 3) Flanagan Bros.; 4) the Calnins; 5) the Krutzs; 6) the DeCleenes; 7) Daniel Whetter; and 8) Donald Zellner. Each of these groups of Plaintiffs purchased their stock in FAH at different times, for different reasons, and on the basis of information provided by different people. Allowing their trials to proceed jointly would not only prejudice Hilliard, but would create jury confusion and make the trial process extremely cumbersome and difficult for the court, its staff, and the parties.

**B.**     **Argument**

Hilliard respectfully requests that this court sever or bifurcate the remaining claims for two reasons. First, the legal standards for severance and bifurcation apply with full force to the present dispute. Second, the separate trials proposed above would provide a logical and straightforward method for the grouping of Plaintiffs and their claims.

    1.     The Propriety of Severance or Bifurcation

First, Hilliard submits that this Court should sever or bifurcate the claims in this case because the legal principles underlying separate trials justify such an Order in this case.

        A.     Severance Under Rule 21

As indicated above, courts generally sever claims under Rule 21 where the claims are separate and discrete, and capable of resolution without regard to the outcome of other claims.

---

[3] Hilliard has identified 12 remaining Plaintiffs because the Fleck Trust, Jossart Trust, and Krutz Trust, are essentially the same as the Flecks, Jossarts and Hahns, respectively. Lastly, Hilliard has, for purposes of the Motion, treated David and Janice Schonke, and their son, Stephen Schonke, as one Plaintiff.

*See Rice*, 209 F.3d at 1016. Plaintiffs' claims fall into this category because they are all predicated on alleged misrepresentations which Plaintiffs purportedly relied on in making their decisions to purchase FAH stock. The evidence regarding these representations will be different for each Plaintiff, and the jury's verdict as to each Plaintiff could be different. Severance under Rule 21 would also allow for separate appeals of each verdict, which would be justified given the unique facts and distinct damage calculations applicable to each Plaintiff.

While all of Plaintiffs' claims present unique issues as to each Plaintiff, the most stark examples appear in Plaintiffs' primary claim - violation of 17 C.F.R. § 240.10b-5(b), which remains for all Plaintiffs. In order to prevail on their private causes of action under Rule 10b-5, Plaintiffs must prove six basic elements (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) justifiable reliance; (5) economic loss; (6) "'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (citations omitted); *see also Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F. 3d 824, 842 (7th Cir. 2007); *Caremark, Inc. v. Coram HealthCare.*, 113 F.3d 645, 648 (7th Cir. 1997). This type of claim presents at least two unique elements that will require separate evidence from each individual Plaintiff.

First, each Plaintiff will need to offer separate evidence with regard to the representations they are challenging. Initially, each Plaintiff will need to establish what material representations were made to them by Hilliard. Additionally, they will need to prove that they relied on the purported representations, and that such reliance was justifiable. These requirements will mandate separate evidence about each Plaintiff's level of sophistication, the documents received by each Plaintiff, the information conveyed to each Plaintiff by Hilliard or others, and related

9

Case 1:05-cv-00694-PJG   Filed 04/15/2008   Page 9 of 20   Document 134

issues that will vary for each Plaintiff. Moreover, while Hilliard would likely need to testify in each trial, the overlapping testimony would be minimal as he will need to recount his recollection of the discussions with each separate Plaintiff.

Second, as indicated in this Court's Order, the causation element for Rule 10b-5 actions has two components that are essentially "plaintiff specific." Each Plaintiff must prove both that he or she "would not have invested in the instrument if the defendant had stated truthfully the material facts at the time of the sale" (transaction causation), and "that it was the very facts about which the defendant lied which caused [Plaintiff's] injuries" (loss causation). (Order at 8, citing *Caremark, Inc.*, 113 F.3d at 648). Therefore, each Plaintiff's claim is "separate and discrete" from every other claim because each Plaintiff must identify the alleged representations that he or she relied on, why they were false, and specifically articulate why *he or she* would not have invested if made aware of the "true" facts. *See Gaffney v. Riverboat Services of Indiana*, 451 F.3d 424, (7th Cir. 2006) (affirming district court's severance of certain claims and noting that "while the facts underlying these claims overlap, the claims are independent of one another"). Further, each Plaintiff must then demonstrate that the alleged representation that induced *he or she* to buy the stock constituted the reason for FAH's failure.[4] Where, as here, the Plaintiffs purchased stock at different points over a three year time line, and where facts and circumstances changed, an alleged misrepresentation or omission could support a claim by certain Plaintiffs, but not others.

For these reasons, each Plaintiff's claims is separate and discrete, and capable of resolution without regard to the resolution of any other claims. The verdict on each Plaintiff's

---

[4] Plaintiffs' strict liability misrepresentation and negligent misrepresentation claims are common law tort claims that also require proof of causation. *See, e.g.*, *Harweger v. Wilcox*, 16 Wis. 2d 526, 534, 114 NW2d 818 (1962); and *Gyldenrand v. Schroeder*, 90 Wis. 2d 690, 698, 280 NW2d 235 (1979).

claims, therefore, should also be separately appealable. Accordingly, severance under Rule 21 is appropriate.

    B.  <u>Bifurcation Under Rule 42(b)</u>

If the Court is not inclined to sever Plaintiffs' claims into separate cases, it should bifurcate the claims by Plaintiff, in the manner described more fully below. Rule 42 allows courts to separate claims or issues for trial in order to avoid prejudice to a party, for convenience, or to expedite or economize the litigation. *See* Fed. R. Civ. Pro. 42(b). Only one of these criteria needs to be satisfied for a court to order separate trials under this Rule. *See MCI Communications v. American Tel & Tel Co.*, 708 F.2d 1081, 1166 (7th Cir. 1983). Courts may bifurcate claims for trial where they are properly joined, namely because of overlapping factual issues, but the nature of the claims is sufficiently unique to justify separate factual inquiries. *See Hohlbein*, 106 F.R.D. at 78.

Here, while there is some factual overlap, such as the information contained in the investment letters, the terms of the subscription agreements, and the successes and failures of FAH, many issues unique to each Plaintiff exist so as to warrant separate factual inquiries at separate trials. Some of these factual differences include: the date or dates on which each Plaintiff purchased stock; the condition of the company on each date; Hilliard's knowledge of allegedly adverse facts as of the date of each Plaintiffs' purchase; the documents each Plaintiff received before purchasing stock; the number of discussions they had with Hilliard prior to purchasing stock; the substance of the discussions with Hilliard; the identity of other individuals who provided each Plaintiff information about purchasing stock in FAH; what representations those other individuals made to Plaintiffs about FAH; the number and substance of any FAH

meetings attended by each Plaintiff; the sophistication of each Plaintiff regarding financial and investment issues; and what representations each Plaintiff relied upon in purchasing FAH stock.

As indicated above, unique legal questions exist as to each Plaintiff as well, including, but not limited to, whether such reliance was justified for each particular Plaintiff, whether each Plaintiff proved the causation elements of their claims based on the facts as of the time of their purchases, and what damage amounts, if any, are appropriate for each Plaintiff. Given these significant issues and their uniqueness to each Plaintiff, bifurcation of the claims in this case is appropriate.

In determining whether to bifurcate claims, courts generally consider: 1) judicial efficiency; 2) the possibility of needless delay; 3) potential juror confusion; 4) timing of the request for bifurcation and whether it was tactical; 5) any overlap of evidence or witnesses; and 6) the prejudice to each party. *See*, *e.g.*, *Trading Technologies Int'l, Inc. v. eSpeed, Inc.*, 431 F. Supp. 2d 834, 837 (N.D. Ill. 2006). Application of these factors to the present dispute supports bifurcation of Plaintiffs' claims should the Court chose not to sever them.

### (1) Judicial Efficiency

Bifurcation of Plaintiffs' claims would further the interests of judicial economy. While bifurcation will result in more trials, each trial will be shorter and streamlined to the specific facts of that particular Plaintiff's claims, or group of Plaintiffs' claims. Given the number of Plaintiffs and claims involved, one trial would create many procedural hurdles and administrative difficulties for the both court, its staff, and the parties. These issues range from simple logistical problems, such as scheduling and seating arrangements, to more complex problems, such as jury instructions and verdict forms. *With regard to the latter, attempting to devise one verdict form that would adequately deal with the complexities of securities fraud*

*actions in the context of 12 different Plaintiffs, with five separate causes of action, would present a monumental task.* Even if the parties and the Court could eventually devise an appropriate form, the potential jury confusion created by the requisite separate questions on liability for each of the Plaintiffs would be significant.

Additionally, narrowing the issues for each trial will reduce evidentiary problems, such as the need for extensive limiting instructions, reduce the time for opening and closing statements, and make preparation of jury instructions easier for both sides. While essentially twelve Plaintiffs remain, Hilliard has only requested eight trials, and submits that the proposed divisions make logical sense in light of the factual differences between each Plaintiff's case.

(2) <u>Needless Delay</u>

The risk of bifurcation creating needless delay is minimal. While the scheduling and trying of eight cases rather than one will take some additional time, the delay is minimal because each Plaintiff would need to present specific evidence with regard to their individual claims regardless of whether it came in their own trial or in one joint trial. Moreover, while each Plaintiff would likely call the same expert, that expert's testimony would need to include specific details about each individual Plaintiff's case regardless of the trial process employed by the Court. This is particularly true in this case because of the causation requirements discussed above. The same is true for the testimony of Hilliard. While he would likely be called in each trial, his testimony at one trial would still involve detailed testimony about his recollections of discussions with each separate Plaintiff.

(3) <u>Jury Confusion</u>

Conducting one trial with all twelve Plaintiffs creates a significant risk of jury confusion, cutting heavily in favor of separate trials. *For example, if the case proceeded as one trial, jurors*

*would be asked to differentiate in their minds between representations made at different times, by different people, with different substantive components, to twelve different Plaintiffs.* The jurors would then be asked to evaluate twelve different damage calculations predicated on different purchase dates, in different amounts, and in some cases at different values. Even for jurors who take copious notes, the task of sorting through the myriad evidence on these issues when it came time to deliberate would prove extremely challenging and run the risk of serious prejudice to both parties. The risk of confusion would be significantly reduced by the grouping of Plaintiffs as proposed by Hilliard.

(4) <u>Timing of Request</u>

The timing of the request provides no tactical advantage to Hilliard. Both parties are preparing for trial and are in the same position. Further, both parties have completed the majority of their discovery and neither will receive a windfall by an order separating the claims in this case. Hilliard submits that separating the claims will streamline the process for both parties and limit the specter of prejudice toward either one.

(5) <u>Overlapping Evidence</u>

The bifurcation of Plaintiffs' claims will create some overlap in evidence and witnesses. This overlap, however, will prove minimal given the nature of Plaintiffs' causes of action, and will not significantly impact either party's case. As indicated above, each Plaintiff will need to present evidence specific to its claims regardless of what form the trial takes. Similarly, the expert will need to offer specific conclusions regarding each particular Plaintiff. The time for such witnesses and testimony will be the same, whether in one trial or eight trials. While some general information about Hilliard and the functioning of FAH will be required in each case and

thus overlap to some extent, this overlap is minimal, particularly when viewed in the context of the benefits afforded by separate trials in this case.

(6) Risk of Prejudice

Proceeding with one trial would create a significant risk of unfair prejudice to Hilliard. *The only alleged misrepresentations that are relevant to each Plaintiff's claims are those that were made to that particular plaintiff.* If the Court were to proceed with only one trial, however, the jury would hear evidence of at least *twelve* alleged misrepresentations. Even the most conscientious of jurors, when attempting to separate and evaluate each Plaintiff's claims, would be tempted to adopt a "where there is smoke there is fire" attitude. Jurors would likely assume that if twelve different sets of investors brought misrepresentation claims, there must be some substance to their accusations. This is an improper inference for the jury to draw and its likelihood would be significantly reduced if the jury only heard evidence that related, in each given trial, to the groups of Plaintiffs proposed by Hilliard. *It is not relevant whether one person or 100 people chose to allege that Hilliard made misrepresentations in connection with FAH; it is only relevant whether Hilliard made material misrepresentations to each particular Plaintiff and whether that Plaintiff justifiably relied on such representations.* Further, any risk of prejudice to Plaintiffs because of separate proceedings is very slight. While some additional time and expense will be required, this is not a case where one plaintiff is asked to present the same case against numerous defendants, thereby significantly increasing the costs and time of the litigation. To the contrary, here there are many Plaintiffs suing one Defendant, and each Plaintiff would be required to put on evidence regarding his or her claim regardless of whether it came in a separate or joint trial.

Accordingly, while Hilliard submits that severance of Plaintiffs' claims under Rule 21 is warranted, it the Court chooses not to do so, bifurcation of the claims pursuant to Rule 42 is appropriate.

### 2. The Trials Should Be Separated By Plaintiff

As indicted above, the most logical way to separate the trials in this case is by Plaintiff. Accordingly, in light of the relevant relationships between the Plaintiffs, Hilliard respectfully submits that the Court order the following eight trials in this case: 1) the Shoenkes, the Hahns, and the Flecks; 2) the Jossarts, the Perrets, the Soletskis, and the Krutzs; 3) the Calnins.; 4) Flanagan Brothers; 5) the DeCleenes; 6) Daniel Whetter; and 7) Donald Zellner. This division makes sense because each group of Plaintiffs will present similar evidence regarding their investments in FAH, and the Plaintiffs' standing alone each have their own factually distinct stories to tell.

#### (A) The Schonkes, Mr. Hahn, and the Flecks Should Proceed Jointly

The first group of Plaintiffs should be the Schonkes (including Mr. S. Schonke), Mr. Hahn, and the Flecks (including the Fleck Trust). Initially, the Schonkes are Mr. S. Schonke's parents. *Deposition of Janice F. Schonke*, January 19, 2007, p. 6 (see April 15, 2007, Declaration of Sean O'D. Bosack ("Bosack Affidavit"), Exhibit A). Mr. Fleck is also the brother of Ms. Schonke. *Id.* at 14-15. Moreover, the Schonkes learned about FAH through Mr. Fleck. Mr. Fleck suggested that the Schonkes invest in FAH, and the Schonkes then told their son about it. *Id.* at 15-16, 47-48; *Deposition of Alfred H. Fleck*, February 12, 2007 (*"Fleck"*), p. 24 (Bosack Affidavit, Ex. B). Finally, Mr. Fleck also got the Hahns involved in FAH through his relationship with Mr. Hahn. *Fleck*, p. 24. Given the family relationships involved and the fact that both the Schonkes and the Hahns obtained their information about FAH through Mr. Fleck,

much of the evidence will overlap and the jury will hear information about many of the same individuals. It therefore seems reasonable to try the claims of these Plaintiffs together.

### (B) The Jossarts, Perrets, Soletskis, and Krutzs Should Proceed Jointly

The claims of the Jossarts (including the Jossart Trust), the Perrets, the Soletskis and the Krutzs (including the Krutz Trust) also share similar commonalities that justify proceeding with their respective actions jointly. First, Mr. Jossart is the twin brother of Ms. Perret. Mr. Jossart also provided the Perrets with information about FAH and suggested that they invest in it. *Deposition of Kathryn M. Perret*, January 30, 2007, pp. 8-9 (Bosack Affidavit, Ex. C); *Deposition of David G. Perret*, January 30, 2007, pp. 21-22 (Bosack Affidavit, Ex. D). Further, the Soletskis were friends with both Mr. Jossart and Mr. Perret. Mr. Perret first told Mr. Soletski about FAH, and referred him to Mr. Jossart, who provided greater detail about the company and expressed a positive outlook about the investment. *Deposition of Paul E. Soletski*, January 23, 2007 ("*Soletski*"), pp. 31, 44-45 (Bosack Affidavit, Ex. E). Mr. Perret, Mr. Soletski and Mr. Jossart also own an LLC together related to the subdivision of land. *Soletski*, p. 42. Finally, the Krutz claims are also related. Mr. Krutz first learned about FAH through Mr. Perret, who is his brother-in-law. Mr. Perret showed Mr. Krutz an FAH brochure and they discussed the likelihood of the Perrets investing in FAH. *Deposition of David W. Krutz*, February 20, 2007, pp. 37-38 (Bosack Affidavit, Ex. F). Moreover, Mr. Krutz believes that Mr. Jossart provided his name to Hilliard as a possible investor. Hilliard then called Mr. Krutz and set up an appointment to discuss FAH with him. *Id.* at 33-34. Accordingly, the Jossarts, Perrets, Soletskis, and Krutzs are all intertwined and a joint trial of their claims would be appropriate.

(C) The Court Should Try The Remaining Plaintiffs' Claims Separately

Hilliard submits that the remaining Plaintiffs' actions should proceed separately. No family or similarly close relationship ties any of the remaining Plaintiffs together, and each of the remaining Plaintiffs got information about FAH directly from Hilliard. Accordingly, sufficient differences exist in the facts underlying their claims to justify independent trials.

First, the Calnins did not hear about FAH through any remaining Plaintiff, but rather through their friends Gladys and Jerry Long. *Deposition of Yvonne M. Calnin*, January 10, 2007, p. 8 (Bosack Affidavit, Ex. G). They then received a phone call from Hilliard, and followed up by setting an appointment to talk with him, which took place at the Calnins' home in Florida. *Id.* at 9. Their decision to invest came after their discussion with Hilliard and watching a promotional video regarding FAH. *Id.* at 10. They also lack any familial relationship with any remaining plaintiff.

Second, Flanagan Bros. also lacked any significant connection with any other remaining Plaintiff. Flanagan Bros. learned about FAH through Hilliard, who called David Flanagan prior to Flanagan Bros. investing money in the company. *Deposition of David D. Flanagan*, February 6, 2007, p. 10 (Bosack Affidavit, Ex. H). David Flanagan was one of the owners of Flanagan Bros at the time of the investment in FAH. *Id.* at 16. On occasion, Hilliard would also drive over and have a face-to-face discussion about the company with Mr. Flanagan. *Id.* at 13. Therefore, Flanagan Bros. did not learn of, or discuss, FAH with any other remaining Plaintiff, and the trial of Flanagan Bros.' claims should proceed separately from those of any other Plaintiff.

Third, the DeCleenes are not related to any other remaining Plaintiff nor learned about FAH from another Plaintiff. They came to invest in FAH simply by way of their contact with

Hilliard. Mr. DeCleene saw Hilliard and Mr. Jossart having lunch at a bar and grill in DePere, Wisconsin and Hilliard set up a meeting with Mr. DeCleene. *Deposition of Gregory J. DeCleene*, February 22, 2007, p. 40 (Bosack Affidavit, Ex. I). Hilliard them came to Mr. DeCleene's residence and explained his idea for starting FAH. *Id.* Mr. DeCleene did not know Hilliard prior to investing in FAH. *Id.* at 42.

Fourth, the first time Mr. Whetter learned of FAH was through a phone call from Hilliard, whom he knew through their mutual interest in boating. *Deposition of Daniel D. Whetter*, February 1, 2007, p. 23 (Bosack Affidavit, Ex. J). Mr. Whetter lacked the funds to invest at first, but ultimately chose to buy stock in FAH. *Id* at 24-25. Mr. Whetter's decision to invest came after his conversations with Hilliard. *Id.* at 27-28. Accordingly, Mr. Whetter lacks any significant relationship with any other remaining Plaintiff and did not learn about FAH through anyone other than Hilliard.

Finally, Mr. Zellner's action should proceed separately. Mr. Zellner is not related to any other Plaintiff and learned about the details of FAH primarily through Hilliard. Mr. Zellner went to high school with Mr. Jossart, who first told Mr. Zellner about FAH and told him to talk with Hilliard about the possibility of investing. *Deposition of Donald W. Zellner*, March 8, 2007, p. 31-32 (Bosack Affidavit, Ex. K). Hilliard then came over to Mr. Zellner's house to talk with him about FAH. *Id.* at 32. Hilliard also called Mr. Zellner to discuss a possible investment in FAH approximately three or four times after their initial meeting. *Id.* at 33. Apart from getting the majority of his information about FAH directly from Hilliard, Mr. Zellner is also the only Plaintiff with a viable misrepresentation cause of action under Wis. Stat. § 100.18. *See* Order, pp. 27-28 (Bosack Affidavit, Ex. L). Given the different elements required for liability under

Rule 10b-5 and Wis. Stat. § 100.18, and the fact that Mr. Zellner obtained the majority of his information about FAH from Hilliard, a separate trial on Mr. Zellner's claims is warranted.

For the aforementioned reasons, Hilliard submits that separating the Plaintiffs' claims into the trials outlined above constitutes a logical and streamlined method for the presentation of evidence and argument to the respective juries.

## VI.  CONCLUSION

For the foregoing reasons, Hilliard respectfully requests that Plaintiffs' claims be severed or bifurcated for trial.

Dated this 15 day of April, 2008.

Respectfully submitted,

  /s/ Sean O'D. Bosack
Winston A. Ostrow
State Bar No. 1016942
Sean Bosack
State Bar No. 1029661
Attorneys for Defendant, Wallace J. Hilliard

GODFREY & KAHN, S.C.
333 Main Street, Suite 600
Post Office Box 13067
Green Bay, WI 54307-3067
Phone: 920-432-9300
Fax:    920-436-7988
Email: waostrow@gklaw.com
Email: sbosack@gklaw.com
3009816_3